## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEVIN L. TUCKER,            :
          Plaintiff,        :      CIVIL ACTION
                           :      No. 17-3598
          v.                :
                           :
DAVID SHULKIN, SECRETARY OF  :
DEPT. OF VETERANS AFFAIRS,
          Defendant.     :

September 3, 2019                              Anita B. Brody, J.

### MEMORANDUM

Plaintiff Kevin L. Tucker brings suit against Defendant David Shulkin, Secretary of the Department of Veteran Affairs, alleging discrimination and retaliation in violation of the Rehabilitation Act ("RA"), 29 U.S.C. § 794 *et seq*. I exercise federal question jurisdiction over Tucker's claims pursuant to 28 U.S.C. § 1331. Shulkin moves for summary judgment. For the reasons stated below, I will grant in part and deny in part Shulkin's motion for summary judgment.

## I. BACKGROUND[1]

### A. Tucker's Disability Compensation from the VA

In 1996, Plaintiff Kevin L. Tucker was discharged from the Army. Def.'s Statement of Facts Ex. 1 [hereinafter Ex.]. After discharge, Tucker immediately applied to the Department of Veteran Affairs ("VA") for disability compensation, claiming herniated cervical (neck) disc, back and neck spasms, temporary blindness, severe headaches, "compacted teeth," upper

---

[1] The facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All facts are taken from the evidence submitted by Shulkin because Tucker submitted no evidence, with the exception of one single-page exhibit.

respiratory infection, acne, shaving bumps, and athlete's feet.  Ex. 1  The VA granted Tucker compensation for his herniated cervical disc claim only, rated 20% disabling.  Ex. 2.

After the decision from the VA, Tucker engaged in protracted appeals to win additional disability compensation from the VA.  Ex. 3.  In 2010, Tucker won an appeal and the VA increased his disability rating to 60%.  Ex. 3.

On August 18, 2010, Tucker filed a claim for increased disability payments, claiming sleep disorder/insomnia, low back pain, left leg and bilateral arm and hand nerve damage, headache, depression/anxiety with suicidal thoughts from headache, and vertigo/dizziness secondary to his headaches.  Ex. 5.  On September 12, 2011, the VA granted Tucker's claims for additional disability compensation for obstructive sleep apnea, major depressive disorder, Type II diabetes, and headaches.  Ex. 8.

On January 27, 2012, Tucker contacted the VA to file a claim for permanent and total disability.  Ex. 9.  On February 8, 2012, the VA sent a letter to Tucker that it was evaluating his claim and needed additional information.  Ex. 10.   In the letter, The VA explained:

> Total disability will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation. . . .  Permanence of total disability will be taken to exist when such impairment is reasonably certain to continue throughout the life of the disabled person.

Ex. 10.  On February 17, 2012, Tucker's doctor examined him and completed a detailed disability benefits questionnaire for his cervical spine (neck) condition, which contained significant information about Tucker's medical condition.  Ex. 11.  The doctor concluded that Tucker's cervical spine (neck) condition impacted Tucker's ability to work such that Tucker "was forced to retire in August, 2011 due to chronic neck pain, inability to turn the neck, and chronic anger and depression secondary to neck pain."  Ex. 11.  On August 13, 2012, the VA

informed Tucker that it was continuing to work on his claim for permanent and total disability. Ex. 12.

On November 19, 2012, while Tucker's claim for total and permanent disability was pending, Tucker began working for the VA as a Veterans Service Representative ("VSR") trainee at the VA Regional Office Veterans Service Center in Philadelphia. Ex. 13. On December 14, 2012, less than a month after Tucker began working for the VA, the VA notified Tucker that his claim for "individual unemployability," also known as permanent and total disability, had been granted and that he was entitled to "special monthly compensation effective August 18, 2010 because you are housebound." Ex. 15. After Tucker's claim had been granted, he continued working for the VA.

On December 5, 2013, while Tucker was still working for the VA, the VA sent Tucker an Employment Questionnaire that asked him whether he was employed by the VA, others, or self-employed at any time during the past twelve months. Ex. 18. The questionnaire informed Tucker: "You are receiving compensation at the 100 percent rate based on being unable to secure or follow a substantially gainful occupation as a result of your service-connected disabilities." Ex. 18. The questionnaire also advised Tucker: "You must complete the required items fully and accurately and return the form to the VA office . . . within 60 days. If you do not return the form within 60 days, your benefits may be reduced." Ex. 18. Upon penalty of fine or imprisonment, the questionnaire required disclosure of any employment during the prior twelve months or a certification of unemployment stating, "I believe that my service-connected disability(ies) has not improved and continues to prevent me from securing or following gainful employment." Ex. 18. Tucker did not return the Employment Questionnaire within sixty days. Ex. 19.

On October 30, 2014, the VA proposed to cut off Tucker's individual unemployability benefits because he had not returned a completed Employment Questionnaire to the VA. Ex. 19. On October 31, 2014, the VA removed Tucker from his position as a VSR due to "failure to follow instructions and absent without leave (AWOL)." Ex. 22. On January 15, 2015, Tucker finally submitted the Employment Questionnaire to the VA, certifying that he had not been employed for the prior twelve months and that he was still unable to work due to his service-connected disabilities. Ex. 24. On April 10, 2015, in light of its receipt of Tucker's Employment Questionnaire, the VA issued a decision withdrawing its proposal to discontinue Tucker's individual unemployability because "the evidence of record shows you are not working and remain unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." Ex. 25. Tucker continued to receive total and permanent disability. Again, on March 30, 2018, he certified in a new Employment Questionnaire, "I believe that my service-connected disability(ies) has not improved and continues to prevent me from securing or following gainful employment." Ex. 27.

**B. Tucker's Employment with the VA**

As previously mentioned, on November 19, 2012, less than a month before Tucker began receiving disability compensation for his permanent and total disability, Tucker began working for the VA as a VSR trainee. Exs. 13, 15. As a VSR trainee, Tucker's job was to process veterans' claims for disability compensation, which included sending letters to veterans informing them of the status of their claims, sending claims files to rating officials to determine percentages of disability, generating awards, and sending letters to veterans informing them of the decision and award on their claims. Ex. 30 at 122:11-124:16.

From the beginning of his employment, Tucker experienced difficulty with the job. Tucker complained that other trainees were mistreating him. Ex. 30 at 72:5-83:19. In addition, he complained that he was not being properly accommodated for certain of his disabilities. Ex. 30 at 72:5-80:13. For instance, Tucker complained on multiple occasions that smells in the workplace were aggravating his service-connected disabilities and leading him to seek medical attention. Ex. 65. On April 5, 2013, Tucker met with the Reasonable Accommodations Coordinator. As a result, the VA provided several accommodations to Tucker, including an ergonomic chair, a support pillow, and a non-glare computer screen. Exs. 43, 44. In response to Tucker's complaint about smells in the workplace, the VA: (1) moved the printer and refrigerator away from Tucker's work area; (2) moved a female employee who wore strong perfume to a different printer so she would not walk by Tucker's work area; (3) instructed an employee to not wear excessive perfume; (4) purchased an air purifier for Tucker's work area; (5) posted signs in the work area to alert employees to refrain from using heavy perfumes/sprays; and (6) instructed employees to refrain from using aerosol cleaning sprays and provided them with unscented cleaning wipes. Ex. 47. In addition, the VA also approved Tucker's request to move to a new location. Ex. 48.

Between November 1, 2013 and February 12, 2014, Tucker was absent from the workplace for forty-one days. Ex. 63. Tucker explained that his absences were due to his disabilities. Ex. 65. On February 12, 2014, Tucker returned to work and was handed a letter that informed him that his duty station was temporarily changed to his home address in Washington, D.C. Exs. 30 at 119:4-22, 70. The letter stated that the VA had "determined that this temporary change in your duty assignment is necessary, until an appropriate Reasonable Accommodation can be found. Importantly, this is not a disciplinary or adverse action. You will receive full pay

and benefits during this period." Ex. 70. Although Tucker was temporarily assigned to work from home, he was not given the equipment to enable him to perform his VSR duties at home. Ex. 30 at 119:4-22; Ex. 82 at 72:15-74:14.

In late February 2014, the VA began exploring whether it could allow Tucker to permanently telework as a reasonable accommodation for his disabilities. Ex. 72 at 52:1-54:17. The VA determined that telework was not an option for Tucker. Ex. 72 at 52:1-54:17; Ex. 81. On May 25, 2014, the VA denied Tucker's accommodation request to telework. Ex. 86. In its denial, the VA stated: " We considered working from home as an accommodation, however we are unable to approve this as an effective accommodation." Ex. 86.

Meanwhile, on March 17, 2014, the VA sent Tucker a letter, informing him that he had to submit medical documentation of his medical condition to support his temporary accommodation of work from home no later than March 28, 2014. Ex. 73. The letter also warned Tucker: "If you fail to provide the medical documentation necessary for further consideration of your temporary accommodation, you are expected to return to duty on Friday, March 28, 2014 . . . . Failure to comply . . . can lead to adverse action up to and including removal from Federal service." Ex. 73. On March 18, 2014, the VA emailed Tucker, requiring Tucker to provide the VA with proper leave requests and medical documentation by March 21, 2014 for Tucker's absences from mid-October 2013 through February 11, 2014. Ex. 74. On March 25, 2014, the VA sent a follow-up email to Tucker, advising him that his absences would now be listed as absent without leave ("AWOL") because Tucker had not submitted the required paperwork. Ex. 74. Tucker received his last paycheck as a VSR at the end of March 2014. Ex. 20 at 209:9-211:11. He received no further pay for his employment with the VA. Ex. 20 at 209:9-211:11.

On April 14, 2014, the VA sent Tucker a Proposed Suspension Notice. Ex. 75. On April 25, 2014, Tucker informed the VA that he planned to return to work on Monday May 5, 2014. Ex. 78. In an April 30, 2014 letter, the VA informed Tucker that he was in AWOL status and he had a "final opportunity to immediately provide medical documentation . . . or report for duty." Ex. 79. Tucker did not return to work on May 5, 2014. Ex. 80. In fact, Tucker never returned to work at the VA after he was temporarily assigned to work from home on February 12, 2014. Ex. 30 at 158:22-25.

On May 29, 2014, the VA proposed to terminate Tucker's employment for "Failure to Follow Instructions and AWOL." Ex. 92. On October 24, 2014, the VA notified Tucker that he was terminated effective October 31, 2014 for "Failure to Follow Instructions and AWOL." Ex. 94.

### C. Tucker's EEOC Complaint and MSPB Appeal

On November 30, 2013, during his employment with the VA, Tucker filed an Equal Employment Opportunity ("EEO") complaint. Def.'s Reply Ex. 1 at 2. On April 2, 2014, Tucker amended his EEO complaint. Def.'s Reply Ex. 1 at 2. On June 24, 2014, the EEO Investigator completed the Investigative Report into Tucker's EEO complaint. Def.'s Reply Ex. 1 at 60. Although neither party has submitted Tucker's original or amended EEO complaint, the Investigative Report summarizes Tucker's claims to include: "Whether [Tucker] was subjected to harassment and a hostile work environment based on reprisal (for prior activity) and disability." Def.'s Reply Ex. 1 at 2. The Investigative Report provides a list of twenty-two events that Tucker alleged were discriminatory in his EEO complaint. Def.'s Reply Ex. 1 at 2-3. The discriminatory events that Tucker alleged include:

19. On December 17, 2013, Ameen Khabir (AK), Assistant Service Center Manager failed to accommodate the Complainant when he brought the

Complainant into his office, closed the door and refused to allow the Complainant to accept medical assistance when the Complainant was coughing and choking uncontrollably from AK's strong smell of cologne.

20. On November 29, 2013, the Complainant felt "ostracized" when he first noticed huge red signs in his work area that stated something to the effect of "Do not wear strong perfume in this cubicle."

21. Since February 12, 2014, instead of accommodating the Complainant by requiring people around him to stop spraying perfume or cleaning solutions, JP assigned the Complainant a temporary change in duty station to work from his home.

22. On March 25, 2014, and although the Complainant has provided the appropriate medical documentation and requested leave without pay through proper administrative channels, PC informed the Complainant via email, that he was charging the Complainant AWOL for periods of absence from October 17, 2013 to February 11, 2014.

Def.'s Reply Ex. 1 at 2-3. The Investigative Report also notes that Tucker "added race (Black) as a basis of this complaint during his formal interview on May 15, 2014." Def.'s Reply Ex. 1 at 3.

Although the Investigative Report does not specifically mention that Tucker complained that the VA failed to accommodate his disabilities by denying him telework, this issue arose during the investigation. During a telephonic examination, the EEO Investigator asked the following question to the Reasonable Accommodations Coordinator for the VA: "[H]ad [Tucker] ever, actually, requested as a reasonable accommodation the ability to work from home?" Ex. 72 at 52:1-3. The Reasonable Accommodations Coordinator responded: "I don't recall if he requested to work from home, but when an employee is requesting to be accommodated and we're going through the interactive process, it's the committee's responsibility to implement an effective accommodation, and that was one of the issues that we considered was the work from home." Ex. 72 at 52:4-10. The Reasonable Accommodations Coordinator also stated that working from home "was an ongoing, kind of, discussion with the committee, an ongoing

conversation that went back and forth, too, from his management team." Ex. 72 at 52:11-15. Furthermore, the Reasonable Accommodations Coordinator noted that the VA decided in April or May 2014 that a VSR could work from home as a reasonable accommodation, but the VA determined that working from home was not a reasonable accommodation for Tucker. Ex. 72 at 52:11-55:10. Tucker also raised the VA's failure to accommodate him during his formal interview with the EEO Investigator. Tucker noted that the VA management didn't want him to go through the Reasonable Accommodation Committee and complained that management had not accommodated him and "had no plan other than having me come back and work." Ex. 20 at 210:7-211:11.

Additionally, although the Investigative Report does not specifically mention that Tucker complained about having his pay suspended starting in April 2014, this issue arose during the investigation. During the EEO Investigator's formal interview of Tucker on May 15, 2014, Tucker specifically complained to the EEO Investigator, "[W]ithin the last month and a half here, I've not been paid for being at home because now they require of me to give them more – I gave them medical evidence every time I came back to work."[2] Ex. 20 at 210:7-11.

On November 30, 2014, while Tucker's EEO complaint was pending, Tucker filed an appeal of his October 31, 2014 termination to the Merit Systems Protection Board ("MSPB"). Ex. 96. In his MSPB Appeal, Tucker alleged that his termination "was retaliation for me contacting the Secretary and Under-Secretary of the VA Benefits about bad practices of the Regional Office." Ex. 96. In June 2017, Tucker withdrew his MSPB appeal and sought to

---

[2] Because neither party has submitted the exhibits to the Investigative Report, and Shulkin has only provided brief extracts from the EEO Investigator's interviews of witnesses, it is impossible to know how many times during the course of the EEO investigation Tucker complained about the VA's failure to provide telework as a reasonable accommodation and the VA's failure to pay him after March 2014.

pursue his claims solely in the EEO forum.  Ex. 97 ¶ 3.  As a result, Tucker's MSPB appeal was

dismissed with prejudice.  Ex. 97 ¶ 4.  Tucker's hearing on his EEO complaint was scheduled for

October 17, 2017, but Tucker elected to withdraw his request for a hearing on June 28, 2017.

Ex. 97 ¶¶ 5, 6.  Accordingly, on July 26, 2017, the Administrative Judge dismissed Tucker's case

as withdrawn.  Ex. 97 ¶ 7.

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is

"genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving

party.  *Id.*  In ruling on a motion for summary judgment, the court must draw all inferences from

the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving

party has met its initial burden, the nonmoving party must then "make a showing sufficient to

establish the existence of [every] element essential to that party's case, and on which that party

will bear the burden of proof at trial."  *Id.* at 322.  Both parties must support their factual

positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

materials in the record that parties may rely on include "depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

The inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

Tucker contends that Shulkin violated the RA when the VA: (1) failed to accommodate his disabilities, (2) constructively discharged him at the end of March 2014 by indefinitely suspending his pay; and (3) terminated him effective October 31, 2014.[3] Tucker alleges that his constructive discharge and termination are the result of the VA's disparate treatment of him and the VA's retaliation against him for engaging in protected activity when he complained about his treatment at the workplace. Shulkin contends that Tucker failed to exhaust his administrative remedies on his claim that the VA failed to accommodate him when it denied him the accommodation of telework[4] and his claim that he was constructively discharged. Accordingly,

---

[3] "The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, applicable to federal employers and to employers receiving federal funding." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (citing 29 U.S.C. § 791(g)). Thus, the requirements for claims under the ADA and the RA are identical. Therefore, the memorandum will rely on both ADA and RA caselaw.

[4] Shulkin also claims that Tucker did not include in his Complaint the claim that the VA failed to accommodate him when it denied him the accommodation of telework. In his Complaint, however, Tucker did include that the VA failed to accommodate his sensitivity to smells. Because telework is one type of accommodation that the VA could have offered him for this disability, Tucker sufficiently pleaded this claim in his Complaint.

Shulkin moves for summary judgment on these claims. Shulkin also seeks summary judgment on Tucker's termination claim because he contends that Tucker failed to exhaust this claim when he filed an appeal with the MSPB but later withdrew it. Regardless of whether Tucker exhausted his administrative remedies, Shulkin also moves for summary judgment based on the contention that Tucker cannot establish any prima facie case under the RA.

### A. Failure to Exhaust Administrative Remedies for Denial of Telework as a Reasonable Accommodation and Constructive Discharge Claims

A federal employee must exhaust Title VII administrative remedies before filing suit against a federal employer for violating the RA. *Freed v. Consolidated Rail Corp.*, 201 F.3d 186, 192 (3d Cir. 2000). This requires a federal employee to contact the EEO within forty-five days of the alleged discriminatory event, 29 C.F.R. § 1614.105(a)(1), and to file a formal EEO complaint within fifteen days of the receipt of the notice of the right to file such a complaint, 29 C.F.R. § 1614.106(b). The relevant test in determining whether an appellant exhausted his administrative remedies as to events that occur after the filing of the EEO complaint, "is whether the acts alleged in the subsequent [RA] suit are fairly within the scope of the prior [EEO] complaint, or the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984). "It has been recognized generally that [EEO] charges should be liberally construed because they are preferred by laymen and are usually prepared without legal assistance." *Canavan v. Beneficial Fin. Corp.*, 553 F.2d 860, 864 (3d Cir. 1977). "'[T]he parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,' . . . [I]f the EEOC investigation is too narrow, a plaintiff should not be barred from raising additional claims in district court." *Robinson v. Dalton*, 107 F.3d 1018, 1025–26 (3d Cir. 1997) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976)). "Because failure to exhaust

administrative remedies is an affirmative defense, the defendant bears the burden of pleading and

proving that the plaintiff has failed to exhaust administrative remedies." *Williams v. Runyon*,

130 F.3d 568, 573 (3d Cir. 1997)

Shulkin argues that Tucker has not exhausted his administrative remedies because he did

not include in his EEO complaint that the VA denied him telework as a reasonable

accommodation and constructively discharged him, and these claims were not fairly within the

scope of the EEO investigation.  In November 30, 2013, Tucker filed his EEO complaint.  On

April 2, 2014, Tucker amended his EEO complaint.  Lastly, in his formal interview on May 15,

2014, Tucker added race as basis of his complaint.  Without providing Tucker's original or

amended EEO complaint to the Court, Shulkin argues, based on the summary of Tucker's claims

in the Investigative Report, that Tucker did not include the telework accommodation denial and

constructive discharge claims in his EEO complaint.  Without the ability to examine these

documents, however, it is impossible to determine whether these claims were fairly within the

scope of Tucker's original or amended EEO complaint, especially given that EEO complaints are

to be liberally construed.

Similarly, it is difficult to determine whether these claims were fairly within the scope of

the EEO's investigation because Shulkin did not submit the exhibits to the Investigative Report

to the Court, and only provided brief extracts from the EEO Investigator's interviews of

witnesses, including only a brief portion of Tucker's formal interview on May 15, 2014.  The

limited portions of  the EEO Investigator's interviews provided by Shulkin to the Court,

however, indicate that Tucker's telework accommodation denial and constructive discharge

claims are fairly within the scope of the EEO investigation.

The Investigative Report acknowledges that Tucker complained that the VA was not providing him with a reasonable accommodation for his sensitivity to smells. Although the Investigative Report does not acknowledge that Tucker also complained that the VA had failed to provide him with the reasonable accommodation of telework for his sensitivity to smells, the Reasonable Accommodations Coordinator told the EEO Investigator during the interview that providing telework as an accommodation for Tucker's sensitivity to smell was an ongoing consideration of the VA, and that it was the VA's "responsibility to implement an effective accommodation, and that was one of the issues that we considered was the work from home." Ex. 72 at 52:4-10. The Reasonable Accommodations Coordinator also informed the EEO Investigator that the VA ultimately denied Tucker's request for telework as a reasonable accommodation. Tucker also complained to the EEO Investigator, during his formal interview on May 15, 2014 that the VA would not accommodate his sensitivity to smells and "had no plan other than having me come back and work." Ex. 20 at 210:7-211:11.

It is undisputed that Tucker included the VA's failure to accommodate his sensitivity to smells in his EEO complaint. Moreover, the Reasonable Accommodations Coordinator relayed to the EEO Investigator that telework was one of the accommodations that the VA explored for Tucker's sensitivity to smells, but ultimately denied. Therefore, Tucker's telework accommodation claim is fairly within the scope of the EEO investigation.

The Investigative Report also acknowledges that Tucker complained about being treated as AWOL for periods of absence from October 17, 2013 to February 11, 2014, even though he had provided appropriate medical documentation and properly requested leave without pay. Although the Investigative Report does not state that Tucker included in his EEO complaint that the VA indefinitely suspended his pay as a result of being labelled AWOL, the record indicates

that Tucker's AWOL status resulted in his pay suspension. Not only did Tucker raise his AWOL status in his EEO complaint, Tucker also made the following complaint to the EEO Investigator during his formal interview on May 15, 2014: "[W]ithin the last month and a half here, I've not been paid for being at home because now they require of me to give them more – I gave them medical evidence every time I came back to work." Ex. 20 at 210:7-11. Based on Tucker's EEO complaint about his AWOL status and his complaint in his formal interview with the EEO Investigator that his pay was suspended as the result of an alleged failure to turn in medical documentation, Tucker's constructive discharge claim is fairly within the scope of the EEO investigation.

Because Shulkin did not submit into evidence Tucker's original or amended EEO complaint, the exhibits to the Investigative Report, or the EEO Investigator's interviews of witnesses, Shulkin cannot meet his burden of proving that Tucker failed to exhaust his administrative remedies. Moreover, based on the scant documents that Shulkin has provided, the record indicates that Tucker's telework accommodation denial and constructive discharge claims are fairly within the scope of the EEO investigation. Therefore, I will deny this portion of Shulkin's motion for summary judgment because Tucker has exhausted his telework accommodation denial and constructive discharge claims.

### B. Failure to Exhaust MSPB Appeal for Termination Claim

As previously discussed, before a federal employee can bring a suit alleging employment discrimination, he must first exhaust administrative remedies. Typically, a federal employee who believes he has been discriminated against will file an EEO complaint. *See Robinson*, 107 F.3d at 1020-21. "However, where a federal employee is subjected to an adverse employment action—like termination—that is appealable to the MSPB, and the employee also believes that

the action was motivated in part by discrimination, the employee can raise a discrimination claim either through a 'mixed case complaint' with the agency's EEO department or a 'mixed case appeal' with the MSPB." *Fissel v. Napolitano*, No. 09-0005, 2009 WL 3624719, at *5 (M.D. Pa. Oct. 29, 2009) (citing 29 C.F.R. § 1614.302(a)). While an employee may either file a "mixed case complaint" with the EEO office or a "mixed case appeal" with the MSPB, he cannot do both. 29 C.F.R. § 1614.302(b). If a person files both a "mixed case complaint" and a "mixed case appeal" on the "same matter," "whichever is filed first shall be considered an election to proceed in that forum." *Id.*

"[A] plaintiff is bound to exhaust administrative remedies in the forum in which he first files a formal petition." *Economou v. Caldera*, 286 F.3d 144, 150 (2d Cir. 2002). Thus, a plaintiff who first files a "mixed case appeal" with the MSPB and later withdraws his MSPB appeal, regardless of whether it is to pursue action before another agency, has not exhausted his administrative remedies. *Stoll v. Principi,* 449 F.3d 263, 266–67 (1st Cir. 2006) ("[O]nce a government employee elects to pursue a mixed case before the [MSPB], she is obliged to follow that route through to completion, to the exclusion of any other remedy that originally might have been available."); *Economou*, 286 F.3d at 150 (holding that a federal employee who withdrew his MSPB appeal in order to pursue an EEO claim had not exhausted his administrative remedies); *Slingland v. Donahoe*, 542 F. App'x 189, 192 (3d Cir. 2013) ("The fact that she voluntarily withdrew her MSPB appeal does not excuse her failure to exhaust.").

Shulkin contends that Tucker's termination claim must be dismissed because Tucker failed to exhaust his administrative remedies when he elected to file an appeal with the MSPB, but then withdrew it to pursue his claim in the EEO forum. It is undisputed that Tucker did not

include his termination in his original or amended EEO complaint.[5]  Because Tucker elected to first file a MSPB Appeal to contest his termination, he was required to exhaust administrative remedies in that forum.  "The fact that Plaintiff voluntarily discontinued [his] MSPB appeal does not allow [him] to jump onto the EEO track."  *Fissel*, 2009 WL 3624719, at *6.  Accordingly, Tucker failed to exhaust his administrative remedies when he withdrew his MSPB appeal. Therefore, I will grant Shulkin's motion for summary judgment on Tucker's claim that he was terminated because of his disability and in retaliation for complaining about his disability.

### C. Failure to Establish Any Prima Facie Claim Under the RA

Tucker contends that Shulkin discriminated against him by failing to accommodate his disability and subjecting him to disparate treatment because of his disability.  In addition, Tucker contends that Shulkin retaliated against him for complaining of mistreatment based on his disability.  To establish a prima facie case of discrimination, a plaintiff must show: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.  *Wishkin v. Potter*, 476 F.3d 180, 185-86 (3d Cir. 2007); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a protected employee activity; (2) he suffered an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action.  *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

---

[5] On November 30, 2013, Tucker filed an EEO complaint.  On April 2, 2014, Tucker amended his EEO complaint.  On June 24, 2014, the EEO Investigator completed the Investigative Report into Tucker's EEO complaint.  Tucker could not have included his termination in his EEO complaint, because he was not terminated until October 31, 2014.

Shulkin argues that summary judgment is appropriate on all of Tucker's RA claims because he cannot establish that: (1) he was qualified to perform the essential functions of the job, with or without reasonable accommodations; and (2) he suffered an adverse employment action. While both a prima facie case of discrimination and retaliation both require a plaintiff to establish that he was subject to an adverse employment action, only a prima facie case of discrimination requires a plaintiff to establish that he was qualified to perform the essential functions of the job, with or without reasonable accommodations. Thus, even if Shulkin is correct that Tucker cannot prove that he was qualified to perform the essential functions of the job, Shulkin will only be entitled to summary judgment on Tucker's failure to accommodate claim and his claim that he was constructively discharged because of his disability. Shulkin will not be entitled to summary judgment on this basis on Tucker's claim that he was constructively discharged in retaliation for his complaints because being qualified to perform the job is not an element of a claim for retaliation. In contrast, all of Tucker's claims are dependent on whether Tucker suffered an adverse employment action.

### 1. Qualified to Perform the Essential Functions of the Job

Shulkin argues that Tucker cannot now establish that he was qualified to perform the essential functions of the job because he previously took the exact opposite position on the disability benefits claim that he filed with the VA for permanent and total disability in which he claimed that his disability prevented him from working. Because Tucker cannot reconcile these patently inconsistent positions, Shulkin asserts that Tucker should be judicially estopped in the summary judgment context from claiming that he was qualified to perform the essential functions of the job. Tucker's only defense for taking these contrary positions, is that he "did not understand that he was 100% permanent and total with unemployability." Pl.'s Resp. 1 at ¶ 1.

In *Cleveland v. Policy Management Systems Corporation*, 526 U.S. 798 (1999), the Court explained "how to approach a claim of judicial estoppel in the summary judgment context" in cases involving conflicting legal positions. *Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 116 (3d Cir. 2003). The Court explained:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Cleveland*, 526 U.S. at 807. Based on *Cleveland*, the Third Circuit has established a two-part test for determining whether a plaintiff's discrimination claim can survive summary judgment when it appears that the plaintiff has made a previous sworn assertion to a court or agency that directly contradicts the assertion the plaintiff is now making in order to establish a prima facie case of discrimination. *Detz*, 346 F.3d at 116-20. The first question is whether the positions taken by the plaintiff are truly inconsistent—a question that must be determined based on the specific facts of the case. *Id.* at 118. The second question, if the two positions are truly inconsistent, is whether the plaintiff has adequately reconciled the two positions. *Id.* at 120.

For purposes of his claim that the VA discriminated against him, Tucker asserts that he is qualified to perform the essential functions of the job, with or without accommodation. However, in seeking and maintaining permanent and total disability compensation from the VA, Tucker previously certified under penalty of fine or imprisonment on several occasions, "I believe that my service-connected disability(ies) has not improved and continues to prevent me from securing or following gainful employment." Exs. 24, 27. Moreover, in support of his claim for permanent and total disability, Tucker submitted a detailed disability benefits

questionnaire that had been completed by his doctor. The questionnaire contained significant information about Tucker's medical condition and the doctor's conclusion that Tucker's cervical spine (neck) condition impacted Tucker's ability to work such that "Tucker was forced to retire in August, 2011 due to chronic neck pain, inability to turn the neck, and chronic anger and depression secondary to neck pain." Ex. 11.

Most egregiously, in the single month of March 2018, Tucker both testified in his deposition for this litigation that he is still "capable of doing work today of the type that [he] had been doing at the VA," Ex. 30 at 162:24-163:21, and certified to the VA that his service-connected disability continued to prevent him from working. In a nutshell, Tucker informed the VA on several occasions under penalty of fine or imprisonment that his disability rendered him *incapable* of working in order to obtain total and permanent disability benefits. He now seeks to advance the position for purposes of this lawsuit that he is *capable* of performing the essential functions of his job. These two positions are genuinely inconsistent. *See Detz*, 346 F.3d at 119-20 (holding that the plaintiff's sworn statement to the Social Security Administration that he was incapable of working was "patently inconsistent" with the position in his employment discrimination suit that he was terminated from a job that he was physically capable of performing); *Motley v. New Jersey State Police*, 196 F.3d 160, 166 (3d Cir. 1999) ("[T]he attainment of disability benefits is certainly some evidence of an assertion that would be inconsistent with the argument that the party is a qualified individual under the ADA.").

Because Tucker's two positions are truly inconsistent, the next question is whether these positions can be reconciled. "[T]o avoid having his claim dismissed [Tucker's] explanation of inconsistent positions must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of or his good faith belief in the earlier statement, he could nonetheless

perform the essential functions of his job, with or without reasonable accommodation." *Motley*, 196 F.3d at 165 (internal quotation marks omitted). Tucker's only attempt at reconciling these contrary positions, is to argue that he "did not understand that he was 100% permanent and total with unemployability." Pl.'s Resp. 1 at ¶ 1. Thus, Tucker wants to avoid his inconsistent positions by claiming that he did not understand what he was saying when he certified to the VA that, "I believe that my service-connected disability(ies) has not improved and continues to prevent me from securing or following gainful employment." Exs. 24, 27. By stating that he did not intend to take the position with the VA that he was incapable of working, Tucker implies that it is not true that he was unable to work. Tucker cannot reconcile his two inconsistent positions by now arguing that his first position—that he could not work—was not the truth. This is because the Third Circuit and the Supreme Court have explicitly instructed a court determining whether two contrary positions can be reconciled to assume that the plaintiff told the truth in his first position or expressed his good faith belief in it. *See Cleveland*, 526 U.S. at 807; *Motley*, 196 F.3d at 165. Moreover, even if Tucker could reconcile these two positions by showing that he somehow mistakenly took his first position and it is incorrect, he has not done so here.

The evidence demonstrates that Tucker sought permanent and total disability over an extended period of time, knowingly submitted a questionnaire by his doctor that said he was "forced to retire" because of his disability, Ex. 11, and certified on several occasions that his disability "prevent[ed] [him] from securing or following gainful employment," Exs. 24, 27. Moreover, in a letter requesting more information regarding his disability claim, the VA made sure to inform Tucker exactly what it meant to seek permanent and total disability, explaining:

> Total disability will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation. . . . Permanence of total disability will

be taken to exist when such impairment is reasonably certain to continue throughout the life of the disabled person.

Ex. 10. Lastly, it is difficult for Tucker to argue that he "did not understand that he was 100% permanent and total with unemployability," Pl.'s Resp. 1 at ¶ 1, when Tucker's position as a VSR at the VA was to process veterans' claims for disability compensation.

The position Tucker now advances that he is qualified to perform the job, with or without accommodations is patently inconsistent with his previous statements to the VA that he had a permanent and total disability. Because these positions cannot be reconciled, I will grant summary judgment on Tucker's discrimination claims, which include his failure to accommodate claim and his claim that he was constructively discharged because of his disability. Therefore, the only claim that remains is his claim that he was constructively discharged in retaliation for engaging in protected activity. This claim remains because whether Tucker was qualified to perform the job is not an element of retaliation.

## 2. Adverse Employment Action

Shulkin argues that Tucker cannot establish that he suffered an adverse employment action. Tucker's only remaining claim is that he was constructively discharged in retaliation for engaging in protected activity. In the context of a retaliation claim, an adverse employment action is one that is "materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). The purpose of the anti-retaliation provision is to prohibit employer actions that deter employees from making complaints of discrimination. *Id.*

Here, Tucker contends that the VA suspended his pay indefinitely in retaliation for Tucker engaging in protected activity. It is obvious that suspending an employee's pay is an

adverse employment action because it is the type of action that would deter a reasonable employee from making a complaint of discrimination.  Therefore, I will deny Shulkin's motion for summary judgment on Tucker's claim that he was constructively discharged in retaliation for engaging in protected activity.

## IV. CONCLUSION

For the above reasons, I will grant Shulkin's motion for summary judgment on Tucker's failure to accommodate and termination claims in their entirety.  In addition, I will grant Shulkin's motion for summary judgment on Tucker's claim that he was constructively discharged because of his disability.  I will deny Shulkin's motion for summary judgment on Tucker's claim that he was constructively discharged in retaliation for engaging in protected activity.

s/Anita B. Brody

_____
ANITA B. BRODY, J.

COPIES VIA ECF ON  9/3/2019